Argument next in Case No. 24-1467, Gentile v. O'Malley. Let's just wait for everyone to settle in. Okay, Mr. Bushlow. Good morning, Your Honors. I'm Alan Bushlow. I'm with the law firm of Abbott, Bushlow & Schechner. And it's my privilege to appear before you this morning on behalf of Appellant Andrea Marie Gentile. Oftentimes in these Social Security cases, on appeal to federal court, you have a situation where there's conflicting evidence supporting both viewpoints, and the court is asked to consider whether the appropriate standard was reviewed to weigh the various conflicting points of evidence or whether the appropriate weighing was not done. Frankly, this is not such a case. In this case, it is unquestionable, first, that the claimant at her hearing was disabled. You had a 34-year-old young woman who had never not lived with her parents. She had never worked. She had... But the question here is not whether she was disabled on the date of the hearing. The question is whether she was disabled as of 2009, right? Well, actually, both questions are important. Because if you have someone who may have been disabled before 2009 but had recovered or improved in their condition or gotten better, they're still not entitled to benefit. So it's actually a two-pronged analysis. First, you have to decide whether the claimant is disabled, and then you have to decide whether the claimant, when that disability began. Right. But the issue that's contested here is 2009. Well, assuming that the claimant was disabled at the time of her hearing, there is absolutely no evidence that it wasn't also true in 2009. When she was... Okay, so the thing that... Look, if I were the fact-finder, I might reason as follows. Here's someone who's never worked. She had various psychological conditions, clearly, before 2009. It makes sense to me that it seems likely that she was disabled all along. But that's making a fact-finding. Here, on the other hand, although she had psychological difficulties, in 2009, she's a student at Queen's College. She successfully completes the program, gets As and Bs, and gets her degree. Now, there's a difference, I guess, between being a student in a school and working at a job. But the question is, what was she capable of at that time, and did her condition then deteriorate at some point in the future? Is there even... I mean, the one person who, I think, issues a clear opinion here is Dr. Ruiz, right? Correct. But is it even clear that Dr. Ruiz is saying, in so many words, she was disabled in 2009? Is that something that... I'm not so sure that Dr. Ruiz is saying that. So who says that? What is the... In terms of just doctors' opinions, who is giving an opinion that says, this is what she could do and could not do in 2009? Well, there's no opinion that says that, but there's a lot of evidence from which the only inference is that she was disabled at that time. For example, at age 16, most young ladies at that age are worrying about going to Sweet Sixteens and the current fashion trends. She's in a psych ward after having attempted to commit suicide. Most young women at that age are not on... Even that, there's evidence in both directions, right? So they give her a global assessment of function when she checks in, and it's 35, which is a major impairment, but then at checkout it's 60, which is moderate symptoms, right? So she improves after getting treatment, right? Which would be expected when you're in a controlled environment of a psych ward, and they wouldn't let you out if you hadn't shown some improvement. She's medicated and is given what sounds like an optimistic prognosis. Now, again, I think you would have to be right that a reasonable person could conclude that she was disabled all the way through, but you're saying that no one could think anything different. No one could think that at age, what would she have been in 2009, 18 or 19, that she lacked various capacities at that time. Now, this is a complicated business to try to project back to figure out what was the date. To assess someone's functional capacities 10 years in the past is a tricky business, isn't it? It absolutely is, and that's the nature of disabled child claims, right? Because you're not entitled to participate in that program until one or both of your parents has either passed away or reached retirement age, and so oftentimes we see in these cases a darth of proof there, and so it requires some inferences. The fact that she comes up with- Well, it doesn't always, right? So Ruiz gives her a diagnosis of schizophrenia in 2022, right? So if she had gotten that diagnosis before 2009, maybe the evidence would have been clearer, but you're saying she didn't get the diagnosis. Your argument is, well, if you look at the evidence, she had impairments that are equivalent to that diagnosis, and that requires a complicated set of inferences, but it's not that every case is going to be that difficult, right? Well, I think part of the reason why in this case you do see the fact that we have to go back and recreate the record, and I think this is to the credit of Mr. and Mrs. Gentile, Andrea's parents, right? Sometimes what you'll see is when a child reaches young adulthood, the family disowns the child, applies for SSI, which is the need-based part of the program that doesn't require earnings, and they're on SSI until the parents retire, and then the parents apply for disabled child benefits for their child, and we have a longitudinal history where they've been on SSI. By definition, they've been disabled, and now we just have to pick up where we left off. The parents in this case, I think, did what we would want them to do. They've supported Andrea their entire lives from their earnings. They didn't ask for a handout from anyone. They paid into the system the way they were supposed to, and now that they are reaching retirement age, they're charged, unfortunately, maybe if they had been warned in advance, they would have kept all of the notes, but there's a lot here that supports the finding that this disability has always been existing. First of all, there's a general presumption, right? If I offer proof that something is true on Wednesday, but I don't have the direct evidence that it was true on Tuesday, but I know it was also true on Monday, we can infer, and we cited the McFarland case. It's a longstanding case, right? So, yeah, that's true. If you have a diagnosis of schizophrenia on Monday and a diagnosis of schizophrenia on Wednesday, probably you'd assume that the diagnosis would apply on Tuesday, but here there isn't a diagnosis until 2022, and she's doing productive activities. But we have other disabling diagnoses beforehand. She was treating with Dr. Caffentaris, right? And Dr. Caffentaris indicates that she's treating her for depression, for anxiety. We know that she's on lithium during this time period. We know she's on Risperdal at various points. We know that, by the way, you know, the college... She gets the treatment, but then the doctor also, you know, says, well, she should get extra sub-accommodations in college, but then she can function in college and, you know, complete tasks and her studies. But she also works at Sears in a law firm, right? Those were failed attempts of less than a month each time. She has no substantial gainful activity in her record and no earnings history. And to go back to the point about her time in college, I actually think that's a fact that supports a finding of disability, doesn't undermine it, because she needed accommodations, she needed a note-taker, she needed extra time on tests, and she had to take two leaves of absence in completing... Right, so she needed these accommodations, right? So the question is not whether she's disabled or has no impairments at all. The question is whether she's completely disabled or has the residual functional capacity to work as a document preparer or a laundry attendant. And so why is it totally precluded from the record for the fact finder to conclude that based on her performance before 2009, where she could complete college with accommodations, she had at least that residual functional capacity? Because the ability to do work is the ability to do work as it's usually and customarily performed in the economy. If you need accommodations to go to class and take notes... But that's the premise of a residual functional capacity finding. You say, okay, here are the impairments and the conditions under which she could work, which is those accommodations. They say, are there jobs that are available in the national economy in which somebody could engage given those limitations? Right. The vocational expert was not asked whether there were any jobs in the United States economy where she would have a note taker provided for her or would be given extra... But you don't need a note taker if you're a laundry attendant, right? But she needed extra time to do things. Her pace, even in college, was slower than what it needed to be. And, by the way, she had to take leaves of absence just to recover from distress. The vocational expert did say that if you have a worker who can't keep up their attendance to tolerated levels, they're unemployable. I would submit to you that the evidence suggests that that would be Ms. Gentile on these facts. The evidence also, the vocational expert also said that somebody that can't remain on task for the full workday would also be unemployable. And the fact that she can't even take notes in class when she's under the age of 22, I think a reasonable supposition would be that she would need similar accommodations in order to be employed. Okay, so the residual functional capacity finding is that prior to attaining age 22, she had the residual functional capacity to perform a full range of work at all exertional levels but with the following limitations. She may never climb ladders, ropes, or scaffolds. She can work where there is no concentrated exposure to extreme heat and cold, wetness and humidity, or respiratory irritants, and no exposure to hazards such as dangerous moving machinery or unpredicted heights. The claimant was capable of performing simple routine tasks with the ability to carry out detailed but not complex written or oral instructions. She may engage in occupations performed in a low-stress setting defined as requiring no assembly line, no fast-paced production requirements, no more than occasional changes in work routine or work setting, and little independent decision-making or goal setting. She can tolerate occasional and only superficial or incidental contact with the public. She is capable of work that, and assume there's a that missing here, once assigned should be performed primarily alone without working in coordination with other employees. So doesn't that describe somebody who is working at his or her own pace in a low-stress setting without a lot of pressure and deadlines and without a lot of intervention from supervisors? Somebody who can take tests and complete school with accommodations seems to have this residual functional capacity. Doesn't that person? With all due respect, Your Honor, even the most low-stress position, you know your work is being judged. You know that you could be fired if you don't do the job the right way. And if someone has the type of psychiatric disabilities that we know, certainly has a- It's not true of taking tests and doing school even if you have a timing accommodation, right? So like- Which is why- She might be judged, would not be able to complete the school program. She wasn't able to complete it without taking two leaves of absence, and it was a four-year program, and it took her six years, Judge. So I think that her college course of study supports the inference that she's disabled. It doesn't counter against it. I think everything from that school experience supports the logical conclusion that the only way she would ever be able to work is if she had accommodations on the job. And by definition, a job with accommodations is not a job that means you can work. It means you're disabled. If you need accommodations, you're disabled. Like I said, if you say here are the limitations on the kind of work you could do, those are accommodations, right? No. I mean, the way it works in the residual functional capacity is not that somebody comes in to modify the expected tax. It's that in advance you define the capacities in terms of the accommodations you would need, and then you determine whether there is a job in the economy that complies with those limitations. So that's a way of accomplishing the same objective as accommodations, right? That's kind of the- No, because the job- The vocational expert is identifying, based on the reference materials, the dictionary of occupational titles, and all of the various other Department of Labor data that the expert is relying on, that he's describing jobs the way they're performed, not with accommodations. I'm sorry. This is an interesting question to me. It's a legal question, I suspect. Are you saying that anyone who would qualify as a person with a disability under the ADA is able for purposes of Social Security? No. I would think not, right? No, it's a different definition of disability. Yeah, if I were blind, there would be certain jobs I could not do. There would be other jobs I could do with accommodations, and the ADA says the accommodations have to be provided if I can get the job done with a reasonable accommodation. But I'm just trying to get a handle on this, because you seem to be suggesting that if she would require an accommodation to do a job that is available in the economy, which would be an accommodation that the employer would be required to provide for a person with a disability, assuming that's a reasonable accommodation, then it would seem to me they would not be disabled for purposes of the Social Security Act. Am I mistaken there? I think it's a little bit, I would say it this way, Judge. I don't think you understand my position exactly. No. If an accommodation is necessary to do the job the way it's normally done in the economy. Then that would not be an accommodation that you would be required to be given. Correct. And then that's a job that you cannot do as a matter of law. Whether in fact, I mean, let's take your blind example. Actually, blindness is per se a disability under the Social Security regulations, right? But the fact that somebody is blind and accomplishes heroic levels of achievement and is able to do certain jobs, they wouldn't be entitled to participate in the program because they are working. Right. What we're looking back at, though, and I think maybe this is what your position effectively has to be. You're saying that we should not, that a reasonable, no reasonable administrative law judge could or should assume that someone who required significant accommodations to get through college must have had the capacity at that time to do a job. Or maybe I have too many negatives in there. I agree with the concept, although not to very much. What we're talking about is trying to assess not where she stands today, where for these purposes I think we are assuming that she is not capable of, that she would have a disability, right? Would be disabled for purposes of the Social Security Act. We're trying to assess whether that was true in 2009 when she was a college student. And the relevant question is what would a reasonable fact finder have to find in light of her ability, the fact that she was given accommodations to get through school. Correct. In light of the fact that she had already been, before age 22, hospitalized once in a psych ward after a suicide attack, had already been heavily medicated, lithium, Depakote, Risperdal, these are not light psychotropic medications. There are people in the workforce who take those medications. There are, but it's certainly an indication of a severe psychiatric disability at that time. The premise of this whole process where you get to residual functional capacity is there will be people with significant limitations who are still not disabled under the Social Security Act, right? Right. And why you do a residual functional capacity finding. But when you, in doing the residual functional... So your argument isn't anybody who needs accommodations in college is ipso facto disabled. It has to be about the severity of the limitations and the extent of the accommodations that are required. Correct. I would posit a hypothetical. If you had someone that had accommodations, no taker, no test and what have you, and they went through school A+, graduated in four years without any problems or issues, I wouldn't be making the same argument. But you have someone that even with those accommodations, she couldn't make it straight through. It took her six years and two leaves of absence due to psychiatric exhaustion. And you saw there's a letter from a treating psychiatrist at the time to the school saying, please give her a leave of absence for medical reasons immediately. And I think we can, again, a lot of this is having to recreate the record after the fact. And like the district court, it's not the district court, but the ALJ recognizes that she completed college in six years with accommodations and notes the letters from the doctor but still says overall she had this residual functional capacity as of 2009. I mean, it is possible to conclude that somebody who had to take a leave of absence during college has a residual functional capacity, right? Right. But, again, when you're doing the residual functional capacity analysis, the point is what jobs as they're performed in the economy without accommodations can that person do? The hypotheticals of the... So what are the jobs that the vocational expert identifies, document preparer and laundry attendant and mailroom clerk, those kinds of jobs? So what is it about those jobs that any reasonable adjudicator would be compelled to conclude that your client would not have been able to perform as of 2009? It's the act of having to be judged by one's employer and the stress of that situation. She was so fragile that she couldn't even do that. And how do we know that? Because she actually tried to commit suicide again when she was in a job that was placed by AccessVR. That's a vocational rehab agency that takes people who need accommodations and tries to train them in a workforce setting and tries to place them in as accommodating and light of demanding job as possible. And she couldn't do it. She wound up back in the hospital after one of those jobs. Now, again, that was after 2009. But what are we to conclude from that? How long after 2009? That was in, I believe, 2012. Okay. Close. Close, right? So the point here is if we're talking about, well, yes, you know, that inference doesn't necessarily mean she was disabled. This inference could be made, but it doesn't have to be made. What evidence is there that she could work? And by the way, I don't think it's completely irrelevant either when you have somebody who's 34 years old and has never worked. Now, she wasn't a housewife. She wasn't raising children. She wasn't that – Well, you just said she was supported by her parents. I mean, we don't – I don't know if that tells you exactly whether she had any capacity to work. But I take your point. But you've reserved time for rebuttal, so we'll hear from you again. All right. But let's turn to the Commissioner, Mr. Hurd. Thank you, Your Honor. Christopher Hurd representing the Commissioner of Social Security. As the Court has recognized here today, the fundamental question in this case is what was Gentile capable of doing during the relevant period from age 16 until her 22nd birthday. In making that finding, the AOJ reasonably relied on evidence of what she actually did during that six-year period. While she had a brief mental health hospitalization, she returned to high school full-time in person. She graduated on time with a regular diploma, receiving minimal accommodations from the school. She immediately went to college where she completed college coursework towards her bachelor's degree, again, receiving some accommodations from the school in terms of note-taking and extra time on tests, but ultimately achieving her diploma within six years. This is entirely consistent with the AOJ's conclusion that while Gentile did have a severe mental impairment and that she was significantly limited by that impairment, she was not so limited that she was incapable of doing even simple, low-stress work. As discussed earlier, plaintiff's primary arguments depend on the opinions from Dr. Ruiz. These opinions issued in 2021 and 2022, more than a decade after Gentile turned 22. As the court recognized, neither one of these opinions purported to assess Gentile's functioning during the relevant period. These opinions – So the AOJ thinks maybe it did, right? The AOJ says, well, I don't think it's talking about 2009, but even if it is, I think that it does not – it conflicts with the notes and other evidence in the record, right? That's correct, John. The AOJ gave it the benefit of the doubt and did specifically address it, the substance, and said that Dr. Ruiz's treatment notes throughout the period – And how does the diagnosis conflict with the treatment notes? I don't know if the diagnosis conflicts with the treatment notes. I think what the AOJ was talking about with respect to the diagnosis was that during the relevant period, Gentile's diagnosis was bipolar disorder. There was no mention of schizophrenia or the schizophrenic spectrum disorder, and that's what Dr. Ruiz is diagnosing here in 2022. So that's one of the things that the AOJ is really kind of keying on, that sort of suggests that her mental impairment has not been static over this 12-year period, but that actually – it's in flux. So during the relevant period, she's got the bipolar disorder that she's diagnosed with, and then when Dr. Ruiz is issuing these opinions in 2021 and 2022, he's talking about schizoaffective spectrum disorder, which is a very different – And Dr. Ruiz starts treating her when? It's 2013, Your Honor, so it's four years. So it's four years after the purported onset date, but then also a number of years before the diagnosis of schizophrenia. Yes, exactly. That's not Dr. Ruiz's initial diagnosis. It's only after several years that Dr. Ruiz reaches that diagnosis, which, again, supports this inference that her mental impairments were not static over this long period of time, but they were fundamentally changing. And what depends on this is her eligibility for the child support program, but if, in fact, she was not disabled as of 2009 but is disabled as of 2022, she can apply for Social Security benefits with that onset date, right? That's absolutely correct, Your Honor. With Social Security benefits, there would be non-disability considerations, as Mr. Bushlow alluded to. In order to get SSI benefits, for example, her household income would have to be below a certain threshold, which could be done if she was, like, paying rent to her parents and she was sort of emancipated. They would not count it, and she could have applied for that. But there's never been a finding by SSA or anyone that she's disabled or meets the medical criteria for disability. Well, that would be a whole new application. Yes. So while Mr. Bushlow has asserted that there's no question that she was disabled at age 34 at the time of her hearing, I would absolutely question that. There's never been a finding of that. That's something that the ALJ essentially did not reach because of the finding of lack of disability at age 22. That wasn't at issue, yes, Your Honor. If she had applied later, the SSA would have made a different determination as to that, and certainly we would have, you know, had our own medical experts proffering opinions on that and would have gone into additional questions. But, you know, as you just acknowledged, as of 2022, she did have the diagnosis of schizophrenia, and so she would have a stronger argument that she has one of the listed impairments, right, as of 2022? As of 2022, yes. Dr. Ruiz's opinion would probably be a lot more probative if she was applying in 2022 than when she's trying to retroactively apply that to her functioning during the earlier period in 2009. What about Mr. Bushlow's argument that, you know, if you require all of these accommodations and medical leaves to get through college, it shows that you just can't do a job the way it's normally performed in the economy? Well, Your Honor, if she could get through college in four years without any of these accommodations, then none of these RFC limitations would be necessary at all. We'd say she didn't have a severe impairment. But the very fact that she had these accommodations, that she needed this extra help to get through school, that's what justifies limiting her to this very restrictive RFC with only, you know, simple work, low-stress work. She's not allowed to do independent goal-setting. She's not allowed to, you know, have independent decision-making. That's all necessitated because she did need these accommodations at school. If she blew through school in four years with no help and it was stressful and she had a psychiatrist who was in therapy for that time, we'd say, well, she doesn't need any limitations in the RFC at all. She struggles, but she can do challenging, high-level work. Well, if a doctor comes along and says she needs to be given a leave immediately, does that suggest that you might have unexpected leaves of absences from an employer at that time? And so maybe that means that you wouldn't be available to do a regular course of employment. I think that's an inference that a fact finder could have drawn. But I think when you're looking at this entire six-year period, the leaves of absence were very limited. I know she had one semester off during the relevant period. She testified she took two semesters off. It's unclear exactly what the chronology of that second semester off was, whether it was during the relevant period or not. But over this six-year period, even if she took two semesters off during that, that's still showing her productivity. As the AOJ acknowledged, she's reasonably productive over this period. She's doing the things that you would expect a 16- to 22-year-old to do during that time. She's completing high school. She's going through college and making significant progress, even though it takes her a little bit longer to graduate than maybe would be ideal. And that's what justifies these. And I think there's also the inference that part of the reason she needed to take that leave of absence was because she was doing work that was beyond her capabilities. She was biting off more than she could chew by getting into this high-level college coursework. She was aspiring to go to law school, so she was holding herself to getting straight A's. And if you read, this is reflected a lot in the therapy notes from this learner from the time, from 2007 to 2009. A lot of her struggles really stem from the fact that she's struggling with her coursework. She's a perfectionist. She's holding herself to these high standards. And when she gets a B, it triggers her depression. It triggers her anxiety. So Mr. Boushelot was saying, well, actually, school is less intense than a job in the economy. But you're saying it might be the opposite, that actually she was taking on too much with the coursework, but a simple job consistent with her RFC would be less stressful. Absolutely, Your Honor. Absolutely. I do think that it was a reasonable inference for the AOJ to draw, that doing college-level coursework, writing English papers, doing these assignments, is going to be a lot more stressful. Well, Mr. Boushelot also made the argument about how she can't do anything, where she has a fear of being judged, and you just talked about how a low grade triggered that kind of anxiety. So why does that mean that she couldn't have a job where there would be a supervisor? Well, I think there's a difference between getting upset about getting a B in a psych class and saying that she couldn't do a job, as you say, as a laundry attendant or a document preparer or any of these very basic sorts of jobs. She's holding herself to a very high standard at school, and that's what's causing this. There's no... So she has that anxiety, but you're saying it wasn't completely paralyzing because she finished the coursework. I don't think that that was so clear from the evidence that a reasonable fact finder would have had to make that inference based on the evidence. You know, you have the consultants who say that there isn't enough evidence. They thought that there wasn't enough evidence about her capacities before 2009 to reach a conclusion one way or the other, right? The ALJ doesn't credit that. If, in fact, that were the case, that there wasn't enough evidence one way or the other to reach a conclusion, does that mean she's not eligible because it's her burden to show a disability? It is her burden to show. I believe under the regulations an ALJ is required to make a determination one way or another. At the earlier, the initial, and the reconsideration phase, the doctors, the consultants can simply say there's not enough evidence. But when you reach the ALJ stage, the ALJ should develop the record further to develop additional evidence that's needed. But ultimately, as you say, it is Ms. Gentile's burden to prove that she is disabled. In this case, some of the medical records that could have substantiated her claim were not available because the application didn't happen until much later in time. So ultimately she has the burden of proving not only that she is disabled but that her disability began prior to age 22. Okay. Thank you very much. Thank you, Your Honor. We'll turn back to Mr. Bushlow on rebuttal. Thank you. I'm going to try to go as quickly as I can. In reverse order, regarding the burden of proof, in Social Security cases there's actually a difference between the burden of production and the burden of persuasion. The burden of production is actually always on the government, and even when a claimant is represented by counsel, it's up to the ALJ to seek more evidence if they don't feel they have enough to make a decision. The burden of persuasion is on the claimant, so I do think that's a distinction. What Mr. Heard just said is that the ALJ is obligated to reach a conclusion, even if the consultant at an early stage says there isn't enough evidence, and the ALJ here did reach a conclusion. In this case, when the consultant said there was not enough evidence, that was an early part of the case. I agree that there wasn't enough evidence at that point. It was only after we got involved and tried to gather whatever we could from the relevant time period that there was any evidence in the record. At the time that the agency consultants looked at it, I don't think they had anything. So I think it's a timing issue there. Regarding the issue of being judged in the workplace versus being judged in school and having major anxiety attacks and having to take a break because you've got a B, let's remember, in college, the student is the customer. You're paying to go to that institution. That's a lot different than when you're being hired to do a job, and you know that if you don't do a good job, you'll be told not to come in the next day. I would argue that the pressure to be an employee is even greater than the pressure to be a student. Is that so obvious that any reasonable fact finder is compelled to make that conclusion? I mean, the argument that Mr. Hurd makes that actually college coursework and an English exam might be different than completing your work as a laundry attendant and might feel less high stakes. Sorry, the coursework might feel more high stakes. I think the reasonable inference is that knowing that you're being judged is going to produce a predictable reaction in both contexts, not just in school but not at work. And if she couldn't handle being judged in the school context, I'm not quite sure why we would infer that she could handle being judged in the employment context where you're there for a specific purpose to meet an employer's production requirements, quality standards or whatever the case may be. Regarding the schizophrenia diagnosis, while it is true that that was only arrived at after the relevant time period, I would submit that's because she was misdiagnosed earlier. She did have a diagnosis. It was anxiety and depression. And there isn't a period of time in this record from her 16th birthday when she was first hospitalized at the mental hospital through the day of the hearing. There isn't a single period of time when she's not under the care of a treatment team, both a psychiatrist and a psychologist, being medicated and displaying symptoms. Now, it is true that her condition is not static, to use counsel's words, and that it was fluctuating over time. Our jurisprudence is crystal clear, especially when it comes to mental impairments, that that's to be expected. Usually when people have mental illness, it's periods of remission followed by periods of exacerbation. And she's evidencing that in this record. That doesn't mean that you don't meet the definition of disability. If anything, it means that those various fluctuations are consistent with mental illness. Regarding the idea that she could apply again right now if this case is unsuccessful, I would submit to this panel that this is Ms. Gentile's only chance at disability. The only way she would be able to apply for benefits is if her parents disowned her, kicked her out of the house, didn't provide her any support. She went on to- But now you're telling me that's because of the household income requirements. It's not because of the inability to show a disability, right? Well, right. I mean, you would argue that she has a disability. I mean, you think it was as of 2009, but certainly you have more evidence as of 2022, because she has the diagnosis. So- Well, she had a diagnosis- You're saying she wasn't able to apply only because she has too much household income, not because she wasn't able to show a disability. Right, because her parents are doing what we would want them to do, which is taking care of their daughter in their home with their resources. The only way she could apply for benefits now is if that stopped being the case. And I would add that when workers work and pay into the system, Social Security, not SSI, and that monthly withdrawal, the weekly withdrawal is taken from their check, part of the benefit that they are buying with that FICA payment is not just if they get disabled or when they reach retirement age, but the math includes a provision that if you have a dependent child that is disabled and you have to take care of them, there's an added benefit that comes from your Social Security earnings to take care of your child, and should you pass away, in lieu of you taking care of them, now your Social Security can go to take care of that child. And the effect of this claim not being reversed and remanded is that Miss Gentile will never be able to benefit from her parents' earnings under that program. And the only way she would ever be able to get anything on account of the disability is if she becomes indigent and qualifies under SSI. And as a society, that's not what we want these people to do. We want them to continue to take care of their daughter in their own home, but they have a right to expect the benefit that they paid for during their entire working lives. Okay. Thank you very much, Mr. Bushlow. The case is submitted.